MJC/HMG2018R00169

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | Criminal No. ELH-20-58 |
| v. | |
| | (Conspiracy to Commit Bank Fraud, |
| MARY BEYER HALSEY, | 18 U.S.C. § 1349; Bank Fraud, 18 |
| | U.S.C. § 1344; Receipt of a Bribe by a |
| Defendant. | Bank Official; 18 U.S.C. § 215(a)(2); |
| | False Statement in Bank Records, 18 |
| | U.S.C. § 1005; False Statement to a |
| | Bank Examiner, 18 U.S.C. § 1005; |
| | Forfeiture Allegation) |

...oOo...

## INDICTMENT

### COUNT ONE

(Conspiracy to Commit Bank Fraud)

The Grand Jury for the District of Maryland charges that:

### Introduction

At all times relevant to this Indictment:

1. Defendant MARY BEYER HALSEY ("HALSEY") was a resident of Maryland.

2. HALSEY was the President and Chief Executive Officer of Cecil Bank located in Elkton, Maryland. As such, under federal and state law, HALSEY was prohibited from engaging in self-dealing transactions for personal gain while acting on behalf of Cecil Bank.

3. Cecil Bank was a financial institution within the meaning of Title 18, United States Code, Section 20. Cecil Bank's deposits were insured by the Federal Deposit Insurance Corporation (FDIC), and the bank was a member of the Federal Home Loan Bank System (FHLB). Furthermore, on December 23, 2008, Cecil Bancorp, Inc., the holding company for Cecil Bank,

received $11,560,000 in federal taxpayer funds under the Capital Purchase Program as part of the Troubled Asset Relief Program (TARP).

4. Rosedale Federal Savings and Loan Association ("Rosedale Federal") was also a financial institution within the meaning of Title 18, United States Code, Section 20. Rosedale Federal's deposits were insured by the FDIC, and the bank was a member of the FHLB.

5. Daniel Whitehurst ("WHITEHURST") was an employee of a real estate development company that did business in Maryland, and borrowed money from Cecil Bank.

6. NOVO Realty, LLC ("NOVO REALTY"), was a real estate company owned by Cecil Bank for the primary purpose of acquiring and selling bank-owned real estate, including collateralized property acquired through foreclosures.

7. On or about April 20, 2011, Cecil Bank initiated the foreclosure of a single-family house located at 127 Ebenezer Church Road, Elkton, Maryland ("127 Ebenezer").

8. On or about November 9, 2011, an exterior-only appraisal ordered by Cecil Bank for 127 Ebenezer showed a market value of $263,000.

9. On or about September 10, 2012, a full appraisal ordered by Cecil Bank for 127 Ebenezer showed a market value of $295,000.

10. On or about November 21, 2012, HALSEY, on behalf of NOVO Realty, LLC, and Cecil Bank, caused the sale of 127 Ebenezer to WHITEHURST for $150,000.

11. In the banking and real estate industries, the purchase of real property using an undisclosed nominee as the purchaser is commonly referred to as a "straw purchase."

**The Scheme and Artifice to Defraud**

12. From in or about March 2012 until in or about June 2013, in the District of Maryland and elsewhere, HALSEY and WHITEHURST knowingly devised and intended to devise a scheme and artifice to defraud two financial institutions, namely, Cecil Bank and Rosedale

Federal, and to obtain money and property owned by or under the custody and control of aforesaid financial institutions, to wit, 127 Ebenezer and related loan proceeds, by means of materially false and fraudulent pretenses, representations, and promises (hereinafter, "the scheme to defraud").

### The Conspiracy to Execute the Scheme to Defraud

13.     From in or about March 2012 until in or about June 2013, in the District of Maryland, the defendant,

**MARY BEYER HALSEY**,

did knowingly and willfully conspire and agree with WHITEHURST to execute, and attempt to execute, the scheme and artifice to defraud, and to obtain moneys, funds, credits, assets, securities, and other property owned by or under the custody and control of Cecil Bank and Rosedale Federal by means of materially false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. § 1344.

### Object of the Conspiracy to Defraud

14.     The object of the conspiracy to defraud was to make material misrepresentations and omissions to Cecil Bank and Rosedale Federal about the value and ownership of 127 Ebenezer so that:

(a)     Cecil Bank and NOVO Realty would sell the property at less than its fair market value;

(a)     WHITEHURST's role as a straw buyer of the property on behalf of HALSEY would be concealed from the banks; and

(b)     HALSEY would personally profit from the purchase, ownership, financing and sale of the property.

### Manner and Means of the Conspiracy to Defraud

15.     It was part of the conspiracy to defraud that HALSEY agreed to help

3

WHITEHURST get approved for a $650,000 personal line of credit from Cecil Bank in return for WHITEHURST agreeing to serve as a straw purchaser of 127 Ebenezer on behalf of HALSEY.

16. It was further part of the conspiracy to defraud that HALSEY and WHITEHURST fraudulently understated the physical condition of 127 Ebenezer to justify the below-market price WHITEHURST paid for the property on behalf of HALSEY.

17. It was further part of the conspiracy to defraud that HALSEY and WHITEHURST fraudulently used inappropriate residential properties as comparables to justify the below-market price WHITEHURST paid for the property on behalf of HALSEY.

18. It was further part of the conspiracy to defraud that when HALSEY sought authorization from Cecil Bank's Board of Directors to sell 127 Ebenezer to WHITEHURST, HALSEY did not disclose her personal interest in 127 Ebenezer nor WHITEHURST's role as her nominee to acquire it on her behalf.

19. It was further part of the conspiracy to defraud that WHITEHURST applied for and obtained a $100,000 loan from Rosedale Federal to buy 127 Ebenezer, fraudulently claiming that he was purchasing the property for himself.

20. It was further part of the conspiracy to defraud that HALSEY wired $75,000 to WHITEHURST's bank account prior to the settlement of 127 Ebenezer to cover the cost of the down payment, as well as closing costs and upgrades to the property.

21. It was further part of the conspiracy to defraud that HALSEY corresponded with WHITEHURST and others before and after the settlement about upgrades HALSEY wanted done to the property.

22. It was further part of the conspiracy to defraud that HALSEY, on behalf of Cecil Bank, signed the Settlement Form as the "Seller" of 127 Ebenezer and WHITEHURST signed it as the "Buyer."

23. It was further part of the conspiracy to defraud that HALSEY concealed the straw purchase of 127 Ebenezer from a bank examiner when the examiner questioned HALSEY about the valuation of the property and WHITEHURST's interest in buying it.

### Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts were committed in the District of Maryland and elsewhere:

A. **Plans for the Straw Purchase**

24. On or about March 28, 2012, HALSEY and WHITEHURST met at a Ruby Tuesday restaurant in Cecil County, Maryland, where HALSEY agreed to review WHITEHURST's request for a $650,000 personal line of credit from Cecil Bank in return for WHITEHURST agreeing to secretly buy 127 Ebenezer on HALSEY's behalf.

25. On or about April 15, 2012, HALSEY sent a text to WHITEHURST stating that she went inside 127 Ebenezer on that date and described the condition as "not bad . . . needs some remodeling because of poor choices. Otherwise in good shape." WHITEHURST responded that he planned to submit the "loan package" soon.

26. On or about April 24, 2012, HALSEY sent her personal Gmail address to WHITEHURST, which they used to correspond about 127 Ebenezer instead of HALSEY's bank email address.

27. On or about April 26, 2012, WHITEHURST emailed HALSEY to update her about a loan package he was assembling "to support an offering price for 127 Ebenezer," including a spreadsheet of purported comparable house prices in the same area.

28. On or about May 9, 2012, HALSEY participated in a loan committee meeting at Cecil Bank that considered and approved a $650,000 line of credit for WHITEHURST.

29. On or about May 14, 2012, WHITEHURST met with HALSEY to review a letter

of intent to purchase 127 Ebenezer that he proposed sending to Cecil Bank. The letter, which listed purported problems with the property to justify the offering price of $145,000, was approved with modifications by HALSEY.

30.  On or about May 17, 2012, WHITEHURST texted HALSEY inviting her to attend a meeting with a flooring company "at your house," in anticipation of Cecil Bank accepting his offer to purchase 127 Ebenezer, and HALSEY agreed to attend.

31.  On or about May 23, 2012, WHITEHURST emailed Cecil Bank his offer to purchase 127 Ebenezer for $145,000, which contained most of the modifications HALSEY suggested during her meeting with WHITEHURST on May 14, 2012.

32.  On or about May 23, 2012, during a meeting of the Cecil Bank Board of Directors, HALSEY advised the Board that WHITEHURST had made a purchase offer of $140,000 for 127 Ebenezer, $5,000 less the actual offer, and further noted that the property had "structural deficiencies and will require significant repairs." The Board authorized HALSEY to "negotiate the best price."

33.  On or about June 18, 2012, WHITEHURST sent an email to a building contractor, copying HALSEY, to explain that HALSEY "needs help with a kitchen redesign for an existing home" referred to as the "Cecil County House," in response to which the contractor offered to meet HALSEY at "You[r] house."

34.  On or about July 31, 2012, WHITEHURST texted HALSEY stating, "Sending new Loi [Letter of Intent], 145 or 150?" to which HALSEY replied "150."

**B.  The Offer to Buy**

35.  On or about August 13, 2012, WHITEHURST submitted a Residential Contract for Sale to Cecil Bank to purchase 127 Ebenezer "As-Is," which contained an amended non-assignability clause allowing WHITEHURST to assign the contract to a related entity.

6

36. On or about August 17, 2012, on behalf of seller, Novo Realty and Cecil Bank, HALSEY signed the Residential Contract for Sale for 127 Ebenezer at the price of $150,000. The contract listed WHITEHURST as the buyer.

37. On or about August 21, 2012, HALSEY emailed the building contractor for the kitchen renovation at 127 Ebenezer to ask if he had any drawings for her to review.

38. On or about October 4, 2012, WHITEHURST emailed a representative of Rosedale Federal asking for a loan to purchase 127 Ebenezer for $150,000, and attaching a recent appraisal of the property for $295,000 that had been prepared for Cecil Bank.

39. On or about October 16, 2012, WHITEHURST signed and submitted a $100,000 loan application to Rosedale Federal for the purchase of 127 Ebenezer, noting that the balance of the $150,000 purchase price would be paid from his Scott Trade Securities account.

40. On or about October 21, 2012, WHITEHURST texted HALSEY that he expected to get the "100K loan for Ebenezer prop[erty] tomorrow," and that he would "make a contract" for her to buy his "Bulle R[o]ck" investment property in Havre de Grace, a pretext for her to wire him $75,000 to be applied toward the purchase of 127 Ebenezer. HALSEY responded, "Great."

41. On or about October 29, 2012, WHITEHURST emailed HALSEY the pretextual purchase contract for the Havre de Grace property that purported to require a $75,000 down payment.

42. On or about October 30, 2012, HALSEY wired $75,000 from her Bank of America account to WHITEHURST's M&T account under the pretext that it was down payment for the Havre de Grace property.

43. On or about November 2, 2012, HALSEY emailed the building contractor to say that WHITEHURST was going to the settlement of 127 Ebenezer the following week, and she attached drawings for the renovation of the kitchen.

44. On or about November 18, 2012, HALSEY emailed the building contractor her design decisions for 127 Ebenezer, including "cabinet colors."

C. **Closing the Sale and Maintaining the Property**

45. On or about November 21, 2012, WHITEHURST brought $52,566 to the settlement of 127 Ebenezer, funds that he had withdrawn from the M&T bank account into which HALSEY had wired $75,000 on October 31, 2012.

46. On or about November 21, 2012, HALSEY signed the HUD-1 Settlement Statement for 127 Ebenezer on behalf of the seller NOVO Realty, LLC, and Cecil Bank, thereby selling the property to WHITEHURST for $150,000, notwithstanding two appraisals ordered by Cecil Bank that showed a significantly higher fair market value, one at $263,000 and the other at $295,000.

47. On or about December 3, 2012, in response to a question from a bank examiner for the Federal Reserve Bank of Richmond inquiring about WHITEHURST's interest in 127 Ebenezer, as well as the bank's "original book value" of $153,000, HALSEY falsely stated, among other things, that she was "not totally familiar with [that] property"; the bank "had difficulty with the initial marketing of the property"; and it was not listed with a realtor because of "issues with the county over the bonds outstanding."

48. On or about January 14, 2013, WHITEHURST emailed HALSEY a running account of the money she owed him for improving and maintaining 127 Ebenezer, including the monthly mortgage payment and loan fees on the $100,000 loan he had secured from Rosedale Federal to purchase the property for HALSEY.

49. On or about January 16, 2013, HALSEY issued a check to WHITEHURST for $20,000.

50. On or about March 21, 2013, HALSEY issued a $15,000 check to WHITEHURST.

51. On or about March 24, 2013, WHITEHURST emailed HALSEY requesting reimbursement of $37,000 for expenses associated with improving and maintaining 127 Ebenezer, including monthly mortgage payments he paid to Rosedale Federal.

52. On or about March 29, 2013, HALSEY issued a $25,000 check to WHITEHURST.

53. On or about April 8, 2013, HALSEY and WHITEHURST exchanged texts about how HALSEY could finance the purchase of 127 Ebenezer from WHITEHURST at a price that would return some of the cash she had put into the property without creating taxable income for WHITEHURST.

18 U.S.C. § 1349

## COUNT TWO

(Bank Fraud)

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 12 and 15 through 53 of Count One are hereby realleged and incorporated by reference herein as though fully set forth in this Count of the Indictment.

2. From in or about March 2012 until in or about June 2013, in the District of Maryland and elsewhere, the defendant,

**MARY BEYER HALSEY**,

did knowingly and willfully execute and attempt to execute the scheme to defraud Cecil Bank and to obtain moneys, funds, credits, assets, securities, and other property under the custody and control of Cecil Bank, to wit, 127 Ebenezer, by means of material false and fraudulent pretenses and representations, namely, HALSEY provided and caused to be provided to Cecil Bank the following:

(a) Information that falsely represented that WHITEHURST planned to purchase and own 127 Ebenezer when, in truth and fact, HALSEY planned to purchase and own the property herself via a straw purchase transaction with WHITEHURST; and

(b) Information that falsely represented the fair market value and physical condition of 127 Ebenezer.


18 U.S.C. § 1344
18 U.S.C. § 2

## COUNT THREE

(Bank Fraud)

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 12 and 15 through 53 of Count One are hereby realleged and incorporated by reference herein as though fully set forth in this Count of the Indictment.

2. From in or about March 2012 until in or about June 2013, in the District of Maryland and elsewhere, the defendant,

**MARY BEYER HALSEY,**

did knowingly and willfully execute and attempt to execute the scheme to defraud Rosedale Federal and to obtain moneys, funds, credits, assets, securities, and other property under the custody and control of Rosedale Federal, to wit, a mortgage for 127 Ebenezer, by means of material false and fraudulent pretenses and representations, namely, HALSEY provided and caused to be provided to Rosedale Federal information that falsely represented that WHITEHURST planned to purchase and own 127 Ebenezer when, in truth and fact, HALSEY planned to purchase and own the property herself via a straw purchase transaction with WHITEHURST.

18 U.S.C. § 1344
18 U.S.C. § 2

11

## COUNT FOUR

(False Statement in Bank Records)

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 12 and 15 through 46 of Count One are hereby realleged and incorporated by reference herein as though fully set forth in this Count of the Indictment.

2. From in or about March 2012 until in or about December 2012, in the State and District of Maryland and elsewhere, the defendant,

**MARY BEYER HALSEY**,

with the intent to defraud and deceive Cecil Bank, did knowingly make false entries in the books, reports, and statements of Cecil Bank, in that HALSEY misrepresented WHITEHURST as the purchaser of 127 Ebenezer and the property's fair market value was $150,000, when in truth and in fact, as the defendant well knew, HALSEY was the actual purchaser 127 Ebenezer and its fair market value was substantially higher than what WHITEHURST paid for it.

18 U.S.C. § 1005

## COUNT FIVE

(False Statement to a Bank Examiner)

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 12 and 15 through 47 of Count One are hereby realleged and incorporated by reference herein as though fully set forth in this Count of the Indictment.

2. From in or about March 2012 until in or about December 2012, in the District of Maryland and elsewhere, the defendant,

**MARY BEYER HALSEY**,

with the intent to deceive a examiner for the Federal Reserve Bank of Richmond appointed to examine the affairs of Cecil Bank, did knowingly misrepresent how Cecil Bank had arrived at the original book value of 127 Ebenezer, as well as HALSEY's familiarity with the valuation of that property, including omitting the material fact that HALSEY had used WHITEHURST to make a straw purchase of the property on HALSEY's behalf at a price HALSEY knew was substantially lower than the property's fair market value.

18 U.S.C. § 1005

## COUNT SIX

(Receipt of Bribe by a Bank Official)

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 12 and 15 through 46 of Count One are hereby realleged and incorporated by reference herein as though fully set forth in this Count of the Indictment.

2. From in or about March 2012 until in or about June 2013, in the State and District of Maryland and elsewhere, the defendant,

**MARY BEYER HALSEY,**

an officer and employee of Cecil Bank, did willfully, knowingly, and corruptly solicit and demand for her own benefit, and corruptly accept and agree to accept for her own benefit, a thing of value, to wit, the straw purchase of 127 Ebenezer, having a value greater than $1,000, intending to be influenced and rewarded in connection with Cecil Bank's consideration and approval of a line of credit for WHITEHURST.

18 U.S.C. § 215(a)(2)

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1. Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 18, United States Code, Section 982(a)(2); Title 28, United States Code, Section 2461(c); and Title 31, United States Code, Section 5317(c)(1) in the event of the defendants' conviction under Counts One through Six of the Indictment.

2. Upon conviction for the offenses set forth in Counts One through Six, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the defendant,

**MARY BEYER HALSEY,**

shall forfeit to the United States all property, real or personal, which constitutes or is derived from proceeds traceable to the scheme to defraud, including, but not limited to a money judgment representing the proceeds She obtained from her participation in the scheme to defraud.

### Substitute Assets

3. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence

    b. has been transferred, sold to, or deposited with a third party

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States, pursuant to 21 U.S.C. § 853(p), shall be entitled to forfeiture of substitute

property up to the value of the forfeitable property described above.

18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(2)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)
31 U.S.C. § 5317(c)(1)

_____
Robert K. Hur
United States Attorney
District of Maryland

A TRUE BILL:

**SIGNATURE REDACTED**      2/13/2020
_____         _____
Foreperson                  Date