**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| V. | : | |
| | | CRIMINAL NO.  DKC-20-0058 |
| MARY BEYER HALSEY, | : | |
| Defendant. | : | |
| | : | |

...oooOooo...

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by its counsel, Robert K. Hur, United States Attorney for the District of Maryland, and Martin J. Clarke and Harry M. Gruber, Assistant United States Attorneys for said District, hereby submits its Sentencing Memorandum in the above-captioned case.

**I.     Introduction**

On February 13, 2020, a federal grand jury returned a six-count indictment against Mary Beyer Halsey for, among other things, conspiring to defraud Cecil Bank while she served as the bank's President and Chief Executive Officer.  ECF 1.  Halsey secretly orchestrated the fraud by using a straw buyer to acquire a house foreclosed upon by the bank, thereby acquiring the house for herself at a price significantly below its market value.

On July 31, 2020, Halsey pled guilty pursuant to a plea agreement to Count One, conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349; Count Four, making a false statement in bank records, in violation of 18 U.S.C. § 1005; and Count Six, solicitation of a bribe by a bank official, in violation of 18 U.S.C. § 215(a)(2)).  ECF 16 and 17.  Halsey's sentencing hearing is scheduled for November 6, 2020 at 11:00 a.m.

1

A.        **Stipulation to Statement of Facts and Advisory Guideline Range**

Pursuant to the plea agreement, Halsey stipulated to facts the government would have proven beyond a reasonable doubt had the case proceeded to trial.  ECF 17, Att. A at 1.  Consistent with those facts, Halsey also stipulated to the applicability of various sentencing factors set forth in the U.S. Sentencing Guidelines ("USSG").  *Id*. at 5-6.  The agreed upon sentencing guideline factors are set forth below.[1]

### **Count One (Conspiracy to Commit Bank Fraud)**

| | |
|---|---|
| Base offense level (USSG §§ 2B1.1(a)(1), 2X1.1(a)) | 7 |
| Upward adjustment for **loss resulting from the offense** (more than $250,000 but less than $500,000) (USSG § 2B1.1(b)(1)(E)) | +8 |
| Subtotal | 15 |
| Upward adjustment for **sophisticated means** (U.S.S.G. § 2B1.1(b)(10)(C)) | +2 |
| Upward adjustment for **abuse of a position of public trust** (USSG. § 3B1.3) | +2 |
| Subtotal | 19 |
| Downward adjustment for **timely acceptance of responsibility** (USSG 3E1.1(a) &(b)) | -3 |
| **Adjusted offense level** | **16** |

The government contends that a further two-level (2) upward adjustment is warranted pursuant to U.S.S.G. § 3B1.1(c), because the defendant was an organizer, leader, manager or supervisor in a criminal activity involving two or more participants, resulting in an **adjusted**

---

[1]        The parties' approach to the calculation of the final adjusted offense level and applicable guideline range is in accord with the Presentence Investigation Report ("PSR") issued by U.S. Probation.

**offense level of 18.**  ECF 17 at ¶(6)(d).  In the plea agreement, the defendant reserved the right to contest this adjustment.  *Id.*  With an upward adjustment for aggravating role, the applicable final guideline range would be **27-33 months imprisonment** (final adjusted offense level of 18 at criminal history category I).  Without that upward adjustment, the applicable guideline range would be **21-27 months imprisonment.**

In accordance with the sentencing guidelines and the statutory considerations under 18 U.S.C. § 3553(a), the government submits that Halsey's many criminal acts warrant **a guideline-sentence of 33 months imprisonment**.  For the reasons set forth below, a 33-month sentence provides an adequate and just punishment for Halsey's brazen self-dealing, which occurred over a long period of time, and at the peak of Cecil Bank's financial distress and reorganization.

## II.     The Law

A sentence must be both procedurally and substantively reasonable.  *United States v. Blue*, 877 F.3d 513, 517 (4th Cir. 2017) (*citing Gall v. United States*, 552 U.S. 38, 41 (2007)).  Reasonableness "is not measured simply by whether the sentence falls within the statutory range, but by whether the sentence was guided by the Sentencing Guidelines and by the provisions of § 3553(a)."  *Blue*, 877 F. 3d. at 517 (*quoting United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006)).  As the Fourth Circuit has noted,

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence. If the court imposes a sentence outside the guideline range, it should explain its reason for doing so.

*Green*, 436 F.3d at 455–56 (*citing United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005)).

Pursuant to § 3553(a), the Court should "impose a sentence sufficient, but not greater than necessary" after considering all of the statutory sentencing factors. 18 U.S.C. § 3553(a). The sentencing factors the Court must consider are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for--
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

*Id.*

### a.      Upward Adjustment for Aggravating Role in the Criminal Activity

Whether Halsey's role in the criminal activity warrants a two-level upward adjustment pursuant to §3B1.1(c) is a factual determination. *See, e.g., United States v. Steffen*, 741 F.3d 411, 415 (4th Cir. 2013). The enhancement for aggravated role applies when "the defendant was an organizer, leader, manager, or supervisor in any criminal activity." USSG §3B1.1(c). "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." USSG §3B1.1(c), comment. (n.2).

The Sentencing Commission included a role enhancement because it had "concerns about relative responsibility" as it relates to multiple participants involved in a criminal scheme. USSG §3B1.1(c), comment. (backg'd). The higher upward adjustments under subsections (a) and (b)

apply to larger organizations, but the Commission noted the inclusion of the 2-level adjustment under subsection (c) for smaller conspiracies, like here, where there are two or more participants.

> In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility.

*Id.*

Section 3B1.1(c) sets forth seven factors the Court must consider when applying the adjustment. *United States v. Cameron*, 573 F.3d 179, 184 (4th Cir. 2009) *citing* U.S.S.G. § 3B1.1.

> [1] the exercise of decision making authority,
> [2] the nature of participation in the commission of the offense,
> [3] the recruitment of accomplices,
> [4] the claimed right to a larger share of the fruits of the crime,
> [5] the degree of participation in planning or organizing the offense,
> [6] the nature and scope of the illegal activity, and
> [7] the degree of control and authority exercised over others.

*Id*; *see also*, U.S.S.G. § 3B1.1(c), comment. (n.4).

The government has the burden of proving the adjustment by a preponderance of the evidence. *See, e.g., United States v. Al-Rikabi*, 606 F.3d 11, 14 (1st Cir. 2010). The sentencing court must make "specific factual findings" to support an aggravating role adjustment. *United States v. Carter*, 489 F.3d 528, 540 (2d Cir. 2007).

## III.   ARGUMENT

Halsey picked the worst time in Cecil Bank's history to devise and carry out a scheme to embezzle one of the bank's assets. Cecil Bank started as a savings and loan association in 1959, and then became a federally regulated commercial bank in 2002. Halsey started working for Cecil Bank in 1980, becoming its President and CEO in 1995.

At the time Halsey initiated her scheme in 2012, Cecil Bank had approximately $442 million in assets, 89 employees and 11 branches throughout Maryland, and it was a wholly owned subsidiary of Cecil Bankcorp, Inc., a publicly traded company on the NASDAQ Small-Cap Market.  However, due to a poor economy and bad banking practices by 2012, the bank had fallen on difficult times and it was in serious financial distress.

In 2009,  regulatory examination by the Federal Reserve Bank ("FRB") reflected a number of concerns about the bank's financial condition and its lack of risk management.  The bank had experienced six straight quarters of net losses, and OREOs represented 9.22% of the bank's total assets.[2]  With an unstable economy placing additional stress on the institution, asset quality deteriorated and Cecil Bank had to accept $10.5 million from the federal Troubled Asset Relief Program (TARP).

On June 29, 2010, in an effort to stop the bleeding, Cecil Bank and its parent company were required to enter into a Written Agreement ("Agreement") with the Federal Reserve Bank of Richmond and the state of Maryland Commissioner of Financial Regulation.  The Agreement prohibited certain business practices, and placed tight restrictions on how Cecil Bank controlled its capital and managed its commercial lending program, including prohibiting the renewal or restructuring of problem loans previously identified by the FRB.

By October 12, 2011, the bank's condition had deteriorated even more and was labeled "critically deficient."  Ex. 1 at 1 (FRB Report of Examination 10-12-11).  Improperly accounting for the sale of OREOs was one of the many problems identified in the report, along with deficient

---

[2] Other Real Estate Owned (OREO) is a bank accounting term that refers to real estate assets that a bank holds, which are not directly related to its business.  Oftentimes, these real estate holdings are acquired because of foreclosure proceedings. A large percentage of OREO assets on a bank balance sheet raises concerns about the overall health of the institution and its lending practices.

liquidity.  *Id.* at 2.  As a result, the FRB recommended that the Board of Governors issue a Cease and Desist Order to address the mounting problems.  *Id.* at 1-2.

After a second on-site examination at the bank, the FRB issued another report on August 20, 2012, declaring that the bank's situation had gotten worse.  Ex. 2. (FRB Report of Examination 8-20-12).  Indeed, the FRB noted that the level of problem assets and poor risk management threatened "the future viability of the bank."  *Id.* at 1.  In addition, the bank's senior management implemented a revised Conflicts of Interest Policy that the FRB deemed inadequate. Consequently, the FRB required senior management to attend ethics training and certify that they had not voted on credit extensions in which "they have a personal financial interest, either directly or indirectly."  *Id.* at 3.

At the lowest point in Cecil Bank's downturn, at a time when it was fighting for its very survival, Halsey decided to recruit Daniel Whitehurst to help her secretly acquire one of the bank's assets (127 Ebenezer) at nearly half its fair market value.

### a.    Halsey was the Leader, Organizer and Manager in a Conspiracy to Commit Bank Fraud.

During the months leading up to the day when Halsey recruited Whitehurst's participation in her straw-buyer scheme, Halsey had been quietly tracking and controlling the bank's foreclosure process in ways that guaranteed that 127 Ebenezer would be available to her at a greatly reduced price.  For example, in discussions with the bank's CFO, Halsey learned about the large difference between the bank's charge-off price of $142,149 and an appraisal suggesting a price of $263,000. If she could get control of the property at the charge-off price, she would benefit personally from that price difference.

Halsey also knew that the bank had two ways to dispose of OREO properties it wanted off its books.  The first way involved bank employees listing the property with a realtor to

professionally market and sell it.  The second way involved a direct sale to a buyer or investor without the use of a realtor.  Sometimes investors would learn about an OREO and contact Halsey directly with an offer.  In such situations, Halsey would take the offer to the Board of Directors without involving other employees.  The employees would only learn about the offer after the Board approved the sale when they had to make arrangements for the settlement.

For the sale of 127 Ebenezer, Halsey chose the direct method in order to reduce the number of employees who might scrutinize the steps she planned to take to effect the straw sale.  On March 15, 2012, Halsey emailed an employee managing OREO properties and told him not to list the property with a realtor.  She falsely claimed that her son had a friend who might be interested in buying it.

Having laid the groundwork within the bank to insure the property's availability for herself, the next phase of Halsey's scheme required recruiting a confederate to pose as an interested and qualified buyer to acquire the title.  The confederate also needed to renovate and maintain the property long enough until it was safe to have it retitled in her name.  As more fully discussed below, the execution of this second phase of Halsey's straw-buyer scheme, the conspiratorial phase, was organized, led and controlled by Halsey.  Her role as the leader, organizer and manager of that criminal activity, warrants the two-level enhancement under § 3B1.1(c).

      **1.**    **Halsey devised the scheme to defraud as well as the quid-pro-quo arrangement used to recruit Daniel Whitehurst's help to execute it.**

From the beginning, Halsey was the creator and driving force behind the conspiracy to fraudulently obtain title to 127 Ebenezer.  It was during a business dinner with Whitehurst in early April 2012 at a Ruby Tuesday's restaurant in Elkton, Maryland, when Halsey first broached the idea of using Whitehurst as her straw purchaser.  Whitehurst wanted to meet with Halsey that day to discuss a legitimate request for a line of credit for a new real estate development company that

he and his partner had formed.  He had no idea about Haley's machinations within the bank over the preceding months to track and control the fate of 127 Ebenezer.  Nor did he know that Halsey had planned to recruit him for her scheme to acquire the property for herself.

To place the meeting in context, for many years Halsey had worked closely with Whitehurst's employer, Clark Turner, the owner of Clark Turner Development Company.  Turner was one of Cecil Bank's largest commercial customers.  At age 27, Whitehurst had worked for Clark Turner since joining the company as a college intern.  Two years earlier, at age 25, Whitehurst got a masters degree in real estate.  By contrast, Halsey was 51 years of age at the time she recruited Whitehurst, and had been in real estate and banking for more than three decades.  During her decades in the industry, she had participated in the financing of significant real estate developments for Turner's companies.

Whitehurst saw the meeting as an important opportunity to start his own real estate business and fulfill his professional aspirations.  If Halsey agreed to support his request for two lines of credit ($500,000 each for him and his partner), Whitehurst could buy rental properties and start land developments on his own, with some being done in tandem with Turner's companies.  As the president and CEO of the bank that could make his dreams come true, Halsey readily understood the emotional dynamic of the meeting and the advantage it gave her.

Before Halsey even considered giving Whitehurst and his partner the lines of credit, she offered him the quid pro quo, *i.e.*, the lines of credit in return for Whitehurst's willingness to serve as her nominee in a real estate transaction, *i.e.*, the straw purchase of 127 Ebenezer.  Essentially, if Whitehurst accepted the bribe, he would have to go to work for her by posing as an informed and willing buyer during the application phase, attend the settlement, renovate the house to her

specifications, and maintain it until it became titled in her name.  Halsey would reap all the financial benefits from the straw purchase.

Before agreeing, Whitehurst asked about the source of the $150,000 that Halsey said he would need to buy the house.  Halsey explained that she would increase his request for the line of credit by $150,000 for a total of $650,000 to cover the purchase price.  Halsey agreed to reimburse him for the purchase price and any renovations she wanted him to do.  Whitehurst agreed.

### 2. Halsey supervised Whitehurt's applications for the lines of credit and the purchase of 127 Ebenezer.

#### i. The Line of Credit

Halsey oversaw every aspect of Whitehurst's request for a line of credit in order to make sure the bank's Loan Committee would approve it.  Before Whitehurst submitted his formal "Loan request" to get a "Working Capital Loan" in April 2012, Halsey reviewed it thoroughly.  Ex. 3 (Memorandum – line of credit - draft).  The handwritten notes she scribbled on Whitehurst's initial draft reflect the edits she wanted him to make.  *Id.*  For example, she did not want the name "Clark Turner" to be included as a person Whitehurst might "partner with," so she crossed it out.  She also changed the "Loan use per unit" to $100,000 and told him to "readjust" the corresponding "LTV" [Loan to Value ratio].  *Id.*  She also wanted Whitehurst to add language in a new section about how he would "secure advances on per unit basis," and "fix fred's [sic] [Whitehurst's partner] cover sheet as well."  *Id.*  Whitehurst followed all of her instructions.  The final draft that he sent to the bank contained all of her changes.  Ex. 4 (Memorandum – line of credit - final).

On May 9, 2012, Halsey and the Loan Committee considered Whitehurst and his partner's request for the line of credit.  Ex. 5 (minutes of meeting).  Halsey helped usher their requests through the process and both were approved.  After the meeting, Halsey contacted Whitehurst to

tell him about the approval (and the higher interest he would have to pay).  Ex. 6 (text, Halsey to Whitehurst).

          ii.    The Letter of Intent to Purchase

To make sure the bank's Board of Directors approved the sale, Halsey oversaw every aspect of the application and approval process, including the submission of a letter of intent to purchase ("LOI") that Halsey directed Whitehurst to draft.  First, Halsey told Whitehurst to find comparable properties near 127 Ebenezer to justify the below-market price that she planned to pay. In response, Whitehurst found six "comparable" properties, and he listed them in the proposed LOI.  Ex. 7 (LOI draft, 5-14-12)

Second, on or about May 14, 2012, Halsey reviewed Whitehurst's first draft of the LOI and made two significant changes.  Ex. 8 (LOI – handwritten notes).  The notes on the LOI reflect that she wanted to reduce the initial offer from $150,000 to "145,000" because, as she explained to Whitehurst, she wanted some leeway in case the loan committee wanted to negotiate a higher price.  *Id*. at 2.  In addition, in a further attempt to persuade the bank to part with the property at a below-market price, Halsey wanted Whitehurst to add another paragraph explaining why the house was in need of substantial repairs.  To that end, she handwrote at the bottom of the page four repairs that she wanted Whitehurst to include in the final LOI.  *Id*.  Whitehurst followed all of Halsey's instructions.  The final LOI that he sent to the bank on May 23, 2012 contained all of her changes. Ex. 9 (final LOI, 5-23-12)

On or about May 23, 2012, Halsey presented Whitehurst's faux offer of $145,000 to the Board of Directors.  Ex. 10 (minutes of Board meeting).  Halsey falsely represented that the property had "structural deficiencies."  *Id*. at 2.  Based on Halsey's representations and her recommendation that the bank consider Whitehurst's offer, the Board authorized Halsey to sell the

property and make the "best deal possible with Mr. Whitehurst." *Id.*  As a result of Halsey's planning and preparation, especially the change she had Whitehurst make to the LOI to offer the lower price of $145,000, Halsey was able to distance herself from the transaction and appear beyond reproach because she finalized the sale at the "best" price of $150,000, the price she always intended to pay.

### 3.   In preparation for the settlement, Halsey organized and managed the transfer of funds and the use of a bogus real estate contract.

Prior to settlement, Halsey told Whitehurst that she changed her mind about having Whitehurst use $150,000 from his new line of credit at Cecil Bank as the source of funds to purchase the house.  In keeping with her frequent reminders not to let the employees at the bank "know her business," Halsey told Whitehurst that she would wire him $75,000 towards the purchase and renovations.  Whitehurst agreed to get $100,000 from a different source (Rosedale Federal Savings and Loan).

To conceal the purpose of the $75,000 in wired funds, Halsey asked Whitehurst if he had any properties she could pretend to buy with a fictitious purchase contract.  At her request, Whitehurst emailed Halsey a fake contract of sale for a property he owned in Havre de Grace, MD. Ex. 11 (fake purchase contract).  To further backstop the pretense, he sent Halsey an email telling her that the property was for sale, but it required a "large deposit of $75,000 to $100,000."  Ex. 12 (email 10-1-12).  With sufficient funding lined up and the down payment backstopped, Halsey scheduled the settlement.

The HUD-1 form for the settlement of 127 Ebenezer epitomized Halsey's leadership, planning and oversight to get Whitehurst to secure the title on her behalf. Ex. 13 (HUD-1).  Halsey

signed as the "seller" and he signed as the "buyer."[3]  *Id*.  However, in actuality, because of the control she exercised over the scheme, when Halsey signed the form on behalf of Cecil Bank as its president and CEO, she was really transferring title to herself as the true buyer via her alter ego, Daniel Whitehurst.  In effect, because of the way she organized and oversaw the scheme, Halsey was simultaneously representing both the seller and the buyer during the settlement, with authority to bind them both.  Whitehurst served as her prop to deceive the bank.

### 4. Whitehurst tracked Halsey's renovation expenses and helped her plan the resale of the property.

Whitehurst was not just Halsey's straw man and stand-in at settlement; he also served as her *de facto* general contractor and bookkeeper.  With title to the property now in Whitehurst's name, Halsey began transforming the property to her liking using work crews and contractors that did work for Turner properties.  Whitehurst introduced Halsey to the contractors so she could pick out her preferred materials and colors.  As agreed, Whitehurst paid for all the labor and materials during the renovation process, which took months.

Whitehurst maintained an accounting of the expenses he paid on Halsey's behalf, including the costs to carry the property pending the transfer of title to her, such as the property taxes, insurance and utility bills.  Ex. 14 at 2 (email requesting payment).  He also paid the monthly mortgage payments to Rosedale Federal Savings and Loan.  Occasionally, he sent her an email listing the expenses and requesting payment, including reimbursement for payments to Rosedale Federal, and she would send him the money.  *Id*. at 1.  In total, Halsey sent Whitehurst approximately $135,000, including the initial $75,000 wire plus an additional $60,000 for renovations.

---

[3] Technically, the seller was Novo Realty, LLC, an affiliate company used by Cecil Bank to hold and market OREO properties.  Hasley signed as the managing member of that affiliate.

At various times during their conspiratorial relationship, Halsey discussed how she planned to get title to the house from Whitehurst, including buying the house in her name or in her sons' names. She told Whitehurst that she planned to make up a story to tell her fellow employees about how it came to be that she owned one of the bank's OREO properties. She said she would tell the employees that she had happened to see the house listed for sale by Whitehurst, she liked the way he fixed it up, and so she decided to buy it. In other words, it was just a coincidence.

Halsey and Whitehurst discussed how they would structure such a sale in terms of pricing. Whitehurst understood that he would not get a share of the equity in the property created by Halsey's original purchase at the foreclosure price. However, he expressed concern about having to pay taxes on the resale of the house to her at a much higher price. Halsey agreed to work out a sale price that minimized the tax consequences for him. Also, to the extent he had to pay additional taxes, she would reimburse him outside the resale settlement process. The resale never happened because they learned in the spring of 2013 that federal agents were investigating financial dealings at Cecil Bank.

### 5. Halsey deflected scrutiny away from the straw purchase.

Just after Whitehurst was recruited, Halsey told him to use her personal email address for discussions about 127 Ebenezer. That way, bank employees would not "know her business." Whitehurst complied with her request.

In addition, as a member of senior management, Halsey oversaw how the bank's administrative staff handled the foreclosure process. Consequently, she could readily identify and address any problems that might reveal her financial ties to the property and Whitehurst.

For example, during on-site examinations by bank examiners, she was questioned about the details of problem loans and the disposition of OREO properties. On one particular occasion,

in December 2012, just after she made the straw purchase of 127 Ebenezer, an FRB examiner questioned the price that Whitehurst had paid for the property. Ex. 15 at 1-2 (FRB email). Halsey lied in response. To protect the conspiratorial relationship with Whitehurst and conceal how she had manipulated the price through his submissions of bogus comparables and exaggerated claims of disrepair, she falsely claimed not to be "totally familiar" with that property. *Id*. at 1. She falsely stated that the bank valued the "property based at what we could sell it for." Ex. 16 at 1 (FRB email). She lied about why the property was not listed with a realtor, and she falsely claimed that they experienced difficulty "marketing" the property. *Id*. at 5.

      **6.**    **Conclusion**

Based upon the considerations set forth in § 3B1.1(c), the foregoing facts warrant the upward adjustment for Halsey's aggravating role in the conspiracy to commit bank fraud. *See* § 3B1.1(c), comment. (n.4). The relative degree of responsibility between Halsey and Whitehurst for the commission of the crime is clear. Halsey was the organizer, leader, supervisor and manager of the criminal activity. Whitehurst was a subordinate participant. They were not equal partners. Halsey decided the scope of Whitehurst's involvement in the conspiracy, and he followed her instructions in all respects.

Halsey was the one who initiated the plan. She recruited Whitehurst to be her accomplice, and he trusted her leadership and experience in bringing the plan to fruition. While Whitehurst ended up with a line of credit in return for his participation in the scheme, he was not entitled to a share of the proceeds from the straw purchase. He was happy fulfilling his limited roles as Halsey's straw buyer, contractor, and bookkeeper in return for the preapproved line of credit.

From making full use of her management position at the bank in order to facilitate the conspiracy, to giving Whitehurst detailed instructions on how to submit and write fraudulent

documents upon which the bank would rely, Halsey supervised Whitehurst's contributions to the conspiracy, managed the progress of the conspiracy, and kept it concealed.

In sum, the facts show that Halsey led, organized, managed and supervised Whitehurst and the overall criminal endeavor.  Consequently, the Court should apply the upward adjustment for her role in the offense.

## IV.    Sentencing Recommendation

Assuming the upward adjustment for aggravating role is applicable, the Court should impose the maximum Guideline-sentence of 33 months imprisonment based upon the sentencing considerations set forth in § 3553(a).  First, regarding the nature and circumstances of the offense, Halsey began planning the scheme by at least March of 2012 when she stopped the property from being listed with a realtor by lying about her son's friend being interested in buying it.  It continued until the summer of 2013 when she learned that certain transactions at the bank were under criminal investigation, so she abandoned her plans to get the title in her name.  Approximately fifteen months of scheming, falsifying documents and managing a property through her surrogate is a long time to be engaged in criminal activity.  It does not appear that Halsey hesitated for a moment during that period to reflect upon the seriousness of her crime and the impact she had on others and the bank she was obligated to protect.

Halsey's embezzlement was not a rash act, like a bank employee diverting cash from a teller drawer, or a bookkeeper intentionally transposing a decimal point.  Rather, it was a long term, deliberately considered plan to abuse her position of trust as the bank's president and CEO in order to manipulate her fellow employees and the Board of Directors for her own personal gain. Her financial interests were paramount, so she used her trusted position to conceal her criminal intent while skulking about the work place conjuring ways to manipulate the banking process.  The

important interests of the bank's employees and shareholders were secondary for most of 2012 and 2013 while she secretly pursued the purchase of 127 Ebenezer at a 50% discount, and then used the savings to upgrade the property.

Halsey's recruitment of Whitehurst is another example of how she used her experience and stature to get what she coveted. At 27 years of age, Whitehurst certainly knew better than to accept Halsey's quid pro quo, and he will have to answer for that. However, Halsey leveraged the imbalance in their relationship to draw the young businessman into the scheme she devised. Soliciting a bribe from a commercial customer is a significant aggravating factor. Instead of getting an acquaintance to pose as the buyer, Halsey chose to brazenly violate the bribery statute in furtherance of her scheme to defraud.

Halsey's aggressive pursuit of 127 Ebenezer did not stop with the commission of two federal offenses. She also lied to a bank examiner who was conducting an examination on behalf of the Federal Reserve System, which was a violation of 18 U.S.C. § 1005. Instead of owning up to what she had done when the examiner first approached her in December 2012 (just weeks after the November settlement), she engaged in more lying and deception to throw him off her trail - and it worked.

Halsey had no qualms about telling the examiner a series of blatant lies to misrepresent how and why she sold the property to Whitehurst at such a low price. The encounter with the bank examiner did not dissuade her, and the scheme continued for many more months. Furthermore, the creation of false bank records in violation of 18 U.S.C. § 1005, including her lies and omissions before the Loan Committee and the Board of Directors, were yet more federal crimes committed in pursuit of 127 Ebenezer. In short, it was an inside job using sophisticated means, and federal laws specifically enacted to regulate banking officials like Halsey did not deter her.

Halsey's indifference to the law and its impact on others and the bank manifested itself in other ways. For example, after the straw purchase on November 21, 2012, Halsey did not switch payment of the property's electric service from Cecil Bank to Whitehurst. Instead, for four straight months, from December 2012 thru March 2013, Halsey allowed Cecil Bank to pay the electric bill. At the end of each of month, Halsey initialed the electric bill and authorized its payment using the bank's funds. Although it was not a lot of money, it constituted additional acts of embezzlement at a time when the bank was experiencing severe financial troubles and Halsey was supposed to be leading the bank's efforts to reduce costs and save money.

Another example of Halsey's ongoing indifference to the law was when she filed for bankruptcy after she left Cecil Bank. The Bankruptcy Court required her to file a detailed petition under oath accounting for all her assets, including real property. On the Schedule A for the petition that Halsey filed, which required her to "list all real property in which the debtor has any legal, equitable, or future interest . . .," Halsey made no mention of 127 Ebenezer. Yet, she had more than $135,000 invested in the property, which Whitehurst had to rent pending resolution of the legal entanglements they both had created by conducting the straw purchase.

Halsey's indifference to the impact the criminal activity had on others was evident in the way her two sons became unwittingly involved in the scheme. Unbeknownst to them, Halsey had used her sons' bank account to pay $50,000 toward the expenses incurred by Whitehurst. One of their names was forged on the $50,000 check drawn from the account. After the settlement, Halsey showed the property to her sons and told them that she had plans to renovate it. Later on, she lied about why she did not take possession of the house, telling them that there was a problem with the well. Moreover, when a pre-indictment resolution could not be worked out, the sons had to testify before the grand jury about their unwitting involvement.

18

Halsey's single-minded pursuit of 127 Ebenezer also showed her indifference to the original owners of the property who she had evicted.  The owners were paying down a note on the property held by a commercial customer who, in turn, owed money to Cecil Bank.  The commercial customer pledged the note as collateral for a commercial loan that he ultimately failed to pay, so Cecil Bank became the owner of the note.

As the new owner of the note, Cecil Bank had the option of modifying the note's terms to allow the owners of the property (the borrowers on the note) to continue residing in the house until they could afford to make the payments or make other arrangements, a common practice in the banking industry.  Holding the foreclosure in abeyance was especially feasible given the fact there was approximately $140,000 of equity in the property to protect the bank's interest.  Instead, Halsey made sure that nothing stopped the foreclosure process so the owners could be evicted and she could take the house for herself and begin renovating it.

Finally, perhaps the most egregious example of Halsey's indifference to the law and its impact on others was the timing of her criminal acts.  By all accounts, Cecil Bank was experiencing a crisis throughout the term of the conspiracy, and there was a great deal of stress and concern among the bank's employees and shareholders.  As already noted, all aspects of the bank were under scrutiny by federal and state regulators, and senior management's authority had been strictly limited.

In the midst of this chaos, Halsey had no compunction about spending her time and the bank's resources facilitating her plan to steal one of the bank's assets.  Even worse, while doing so, she publicly feigned concern about the bank's welfare.  For example, Halsey wrote a letter to the shareholders as part of the 2012 Annual Report, a time during which her scheme was well underway.  Ex. 18 (Annual Report).  She told the shareholders, among other things, that she was

committed to "resolving problem assets" and stabilizing charge-offs, and despite a challenging economy she planned to "continue to build good business practices." *Id.* She noted that as the bank moves forward "we must keep in mind the elements that made us successful in the past, but view them in a different light." *Id.*

In addition, Halsey had to sign and approve the quarterly report filed with the SEC for the period ending September 30, 2012. By that date, Halsey had already coached Whitehurst on the filing for the letter of credit, as well as falsifying the information on the letter of intent to purchase. Days later, Halsey asked Whitehurst to create the fake contract to backstop her $75,000 wire transfer. Notwithstanding the progress she was making toward illegally acquiring one of the bank's assets, she endorsed the following statement in the SEC quarterly report about the bank's viability:

> Due to our elevated level of nonperforming assets and recurring operating losses, there is substantial doubt regarding our ability to continue as a going concern. Management is taking steps to improve our financial condition.

https://sec.report/Document/0000946275-12-000422/ (page 7). Tellingly, Halsey certified under 18 U.S.C. § 1350 that the information contained in the quarterly report "fairly presents, in all material respects, the financial condition and results of operations" of the bank. *Id.* at Exhibit 31(a). Halsey made that certification on November 14, 2012, exactly <u>one week</u> before signing the HUD-1 at settlement conveying 127 Ebenezer to herself.

In light of Halsey's brazen abuse of her position of trust in a longstanding and sophisticated scheme to defraud her own bank, a sentence of 33 months imprisonment is warranted under § 3553(a). Bank employees, shareholders, and the community at large must be able to trust the people responsible for running our banks and maintaining our financial system. Local and regional banks managed with integrity are critically important to sustaining a vibrant business environment

within the community.  Therefore, would-be corrupt bank executives, like Halsey, must be deterred.  Significant sentences of imprisonment provide that deterrence.

For all the reasons set forth above, a sentence of 33 months imprisonment provides an adequate and just punishment for Halsey's longstanding pattern of criminal conduct, and serves to deter other would-be corrupt bank executives.

<div style="margin-left: 40%;">

Respectfully submitted,
Robert K. Hur
United States Attorney

By:   _____/s/_____
Martin J. Clarke
Harry M. Gruber
Assistant United States Attorneys
Office of the United States Attorney
District of Maryland

</div>

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 23rd day of October 2020, a copy of the foregoing

*Government's Sentencing Memorandum* was electronically filed and made available to counsel

of record.

_____/s/_____
Martin J. Clarke
Assistant United States Attorney